JFM, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
JFM, Inc. v. Commissioner
Docket No. 2470-92
United States Tax Court
T.C. Memo 1994-239; 1994 Tax Ct. Memo LEXIS 234; 67 T.C.M. (CCH) 3020; May 26, 1994, Filed; As Corrected June 6, 1994 *234 For petitioner: Harris H. Barnes III. For respondent: J. Craig Young. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioner's 1986 and 1987 consolidated Federal income tax in the amounts of $ 60,558 and $ 30,508, respectively. The issues presented for our consideration are: (1) Whether franchise fees are includable in the year of receipt or in the year the contractual performance is complete; and (2) whether gasoline pump canopies, fixtures, and signs should be classified in a 20-year depreciation class life, as determined by respondent, or in a shorter-year class life as advocated by petitioner. FINDINGS OF FACT [1]
General Background
Petitioner, JFM, Inc., and its three wholly owned subsidiaries (JFM) are all Delaware corporations with their principal place of business in *235 Jackson, Mississippi. Consolidated returns were filed for 1986 and 1987, and the accrual method of accounting was employed for tax and financial purposes. JFM was incorporated during 1920 under the name "Jitney Jungle, Inc." JFM sold supermarket franchises until the early 1960s, when it began franchising convenience stores under the name "Jitney Junior". Beginning in 1972, the franchise name was changed to "Junior Food Mart" (Mart). Franchise Fees
During the 1980s JFM was under contract with about 60 franchisees, each operating from 1 to 70 Marts. At the time of trial, franchisees operated about 375 Marts in about 19 States, with about 90 percent being operated in Mississippi and surrounding States. JFM also operates several Marts without intermediary franchisees. The preliminary step to entering into a franchise agreement is for JFM and the potential franchisee to enter into a territorial agreement providing for an exclusive geographical area of operation, usually several counties. Then JFM locates and acquires an option to purchase realty to construct a Mart. Thereafter, JFM locates an investor to purchase the land and, in turn, build a Mart and enter into a sale/leaseback *236 agreement with JFM. Usually the land and Mart building are owned by an investor and JFM leases the realty from the investor for a 15-year term. If the operation is successful, leases are renewed for successive 5-year terms. The territorial agreement remains in effect during the term of the lease agreement. Under the standard territorial agreement, JFM is obligated to perform significant services to franchisees, including: Selecting and procuring the Mart site; constructing the Mart building and leasing it to the franchisee; assistance in recruiting, hiring, and training of employees for up to the first three Marts of a franchisee; assistance in ordering and stocking of merchandise for up to the first three Marts of a franchisee; and consultation and merchandising assistance as reasonably requested by a franchisee. During the years in question, the franchisee would pay a $ 25,000 "territory fee" upon execution of the territorial agreement. The $ 25,000 fee was a figure devised to cover the cost of establishing a franchise. In some instances costs to JFM of establishing and servicing a franchise operation are $ 10,000 to $ 15,000 less than the fee and, in other instances, the *237 cost may exceed the fee by $ 25,000 to $ 35,000. The majority of JFM's income is generated by its receipt of a percentage of sales (i.e., 1 percent of sales). Following execution of the territorial agreement, JFM begins incurring expenses in the performance of its obligations under the agreement. Those expenses are deducted in the same year as they are incurred. The $ 25,000 fee, however, is generally reported in the year after the year of receipt. JFM considers the $ 25,000 fee earned when the first basic Mart is operational. This approach is based upon JFM's obligation to meet the commitment to enable the franchisee to operate a Mart business. Generally, it takes about 18 months to complete JFM's franchise obligations. After receipt of the $ 25,000 fee, the funds are not segregated, but commingled with JFM's funds. The $ 25,000 fee is not refunded so long as JFM is capable of performing its obligations under the territorial agreement. JFM has refunded about 4 of about 800 fees. The refunds were due to JFM's inability to locate a suitable initial Mart site. During 1986 JFM received $ 50,000 in fees, which were not reported until 1987. During 1987 JFM received $ 57,500 *238 [2] in fees, which were not reported until 1988. Depreciation Class Life Category
Sunburst Energy, Inc. (Sunburst), is a JFM subsidiary incorporated in 1982 to enter into gasoline operating agreements with Mart franchisees. Sunburst leases some of the land adjacent to the Mart building. On the leased land, Sunburst installs and retains ownership in gas tanks, pumps, gas islands, canopies, wiring, and an electronic console inside the Mart which displays gas purchases. Sunburst and the franchisees enter into agreements under which the franchisee collects and deposits the receipts from gasoline sales, in return for which Sunburst pays a monthly commission, typically 50 percent of *239 the profits from the gasoline sales. JFM claimed $ 86,357 and $ 121,404 for depreciation of gasoline pumps, canopies, fixtures and signs for 1986 and 1987, respectively. Respondent, in the notice of deficiency, disallowed $ 59,275 and $ 78,994 of the claimed depreciation deductions for 1986 and 1987, respectively. The parties have stipulated the asset descriptions, cost bases, dates of capitalization, the amount of depreciation claimed in prior years, and the method of depreciation -- Accelerated Cost Recovery Systems or Modified Accelerated Cost Recovery Systems (ACRS or MACRS). The remaining controversy between the parties concerns the proper class life for the gasoline pump canopies, fixtures, and signs. A gasoline pump canopy (canopy) is designed to protect customers and gasoline equipment from the elements and to provide advertising of the product and/or business name. Beginning in the early 1980s, the average size of canopies has increased to accommodate multiple sets of dispenser pumps and more gasoline pumping areas. Average-sized canopies have increased from about 24 feet by 48 feet in 1984 to 24 feet by 70 to 90 feet in 1986 and 1987. As of the time of trial, the *240 largest canopies measure about 70 by 120 feet. The largest canopies now have as many as 96 light fixtures built into them. Canopies are constructed of steel superstructures with aluminum side panels ranging from 6 inches to 4 feet high. The side panels bear the brand names, colors, and logos of gasoline companies and/or the Mart. The canopy is supported by posts bolted onto four to six special concrete footings which are generally 3 feet deep and about 2 feet square. The posts are in turn bolted to I-shaped beams which connect to additional beams supporting the roof, side, and bottom panels. Several rows of lights are installed underneath the canopy and a rain removal gutter system is installed around the periphery. A canopy, during the years in issue, could be installed by a crew of four in 3 days and taken down by a crew of three in 2 days. A crane is necessary to install and dismantle a canopy. Some damage may occur to panels during the dismantling of a canopy. Canopies usually require renovation or repair after about 5 years; most frequently the side and under panels are repaired or replaced. Wind is a primary cause of canopy damage. Repairs or renovation can *241 vary from $ 2,000 to the cost of an entirely new canopy. Side panels in serviceable condition may have to be replaced if the gasoline brand changes at a particular Mart. If additional gasoline pumps are added, canopies are either extended or totally replaced. When a switch is made from single to multiple dispensing pumps, it is usually more feasible to remove the old and install a new canopy, rather than modify the old one. Sunburst purchased and installed 14 canopies during 1984 and 1985. At the time of trial, of the 14 canopies, 1 had been damaged by a hurricane and required extensive repairs; at least 2 had been sold to third parties for reuse; at least 3 were taken down and either moved to another location or extensively rebuilt and reinstalled at the same location; at least 3 have had no work or modifications done; 2 have had the side panels changed; and there is insufficient information regarding the remainder to specifically categorize their historical pattern. Absent wind damage and obsolescence, a canopy could last 10 or more years. OPINION A. Franchise Fee -- Year of Includability -- JFM realizes fees in the year the agreements are entered into and does not *242 recognize them for income tax purposes until the time all possible obligations under the agreement are complete. Respondent disagreed with JFM's method of reporting the fees and determined that the fees were reportable in the earlier year under the accrual method of accounting. The issue here concerns the concept "clear reflection of income" under section 446. [3]
Section 446(b) permits the Commissioner broad discretion to determine whether a particular method of tax accounting clearly reflects income. RLC Industries Co. v. Commissioner, 98 T.C. 457, 491 (1992). That determination is entitled to more than the usual presumption of correctness and "'should not be interfered with unless clearly unlawful.'" Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979) *243 (quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930)). JFM bears the heavy burden of showing that respondent's determination is plainly arbitrary. Thor Power Tool Co. v. Commissioner, supra; Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930). For JFM to prevail, it must prove that respondent's inclusion of fees in the year received, i.e., prior to the year reported, is arbitrary and capricious and without sound basis in fact or law. Ford Motor Company v. Commissioner, 102 T.C. 87, 90 (1994). JFM uses the accrual method of accounting for financial and tax reporting purposes. The accrual method does not focus on the time of payment or receipt, but upon the time there is an obligation to pay or a right to receive. See United States v. Hughes Properties, Inc., 476 U.S. 593, 599, 604 (1986); Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184 (1934). The all events test was judicially devised to measure whether and when an item should be accrued or reported. *244 The all events test was formulated in case law more than 50 years ago and has long been embodied in section 1.461-1(a)(2), Income Tax Regs., which contains the following two requirements: Under an accrual method of accounting, an expense is deductible for the taxable year in which [1] all the events have occurred which determine the fact of the liability and [2] the amount thereof can be determined with reasonable accuracy. * * *
Here we consider a situation where JFM is paid the full established amount of a fee upon execution of a territorial agreement and is then obligated to perform various services for the franchisee in connection with the startup of a Mart franchise. These services are usually performed over an 18-month period, culminating when the Mart is fully operational. The services to be performed are substantial and occasionally may cost twice the fee amount. On the other hand, occasionally, the service may cost less than half the fee amount. The services include selecting and procuring the Mart site; constructing the Mart building and leasing it to the franchisee; assistance in recruiting, hiring, and training of employees for up to the first three Marts *245 of a franchisee; assistance in ordering and stocking of merchandise for up to the first three Marts of a franchisee; and consultation and merchandising assistance as reasonably requested by a franchisee. Of about 800 franchise situations, JFM has returned about 4 franchise fees. The refunds occurred only in situations where JFM was unable to locate a suitable site for a Mart within the franchisee's territory. Chronologically, the location of a Mart site is one of the first obligations performed by JFM. Additionally, it is likely that the site will be located during the earliest portion of the 18-month process in establishing an operational Mart. Although it is possible that the fee may be received on the last day of JFM's taxable year and no work may be performed during the year of receipt, JFM has not shown any such pattern with respect to the transactions it has experienced. The pattern is one where the fee is received at the time of execution of the agreement during year one, and the Mart is completely operational about 18 months later during year two, the year in which JFM reports the fee. JFM relies heavily upon Artnell Co. v. Commissioner, 400 F.2d 981 (7th Cir. 1968), *246 revg. and remanding 48 T.C. 411 (1967). In that case a baseball team had sold advance tickets for the season and its stock was acquired by the taxpayer early in the baseball season (prior to May 31, the tax yearend for the baseball team). As games were played, the taxpayer recognized the prepaid tickets in income, but the Commissioner determined that the prepaid tickets were includable by the taxpayer in the return for the prior tax year ended May 31, by which time all of the tickets had been prepaid. This Court, relying upon several Supreme Court opinions and its own opinions, [4] held that the Commissioner could apply section 446(b) and require prepaid income to be taxed when received, even if the taxpayer uses the accrual method of accounting for tax purposes. Artnell Co. v. Commissioner, 48 T.C. at 414-415. The Court of Appeals for the Seventh Circuit reversed and remanded for further proceedings in this Court holding that the principle that prepaid income must be reported in the year of receipt at the Commissioner's discretion is not an absolute one. The Court of Appeals' opinion contained the reasoning that it was *247 possible that a particular taxpayer's method could so clearly reflect income that it would be an abuse of discretion for the Commissioner to require recognition in the year of receipt.
On remand, this Court found that the taxpayer's method of accounting more clearly reflected income because it more effectively matched income and expenses in the same accounting period, one of the goals of the accrual method. Artnell Co. v. Commissioner, T.C. Memo. 1970-85. *248 The criteria used by this Court on remand resided in the principle that the "purpose of the accrual method of accounting is to allow the matching in a single fiscal period of revenues and expenses attributable to economic activities carried on within such period. United States v. Anderson, 269 U.S. 422 (1926)". Artnell Co. v. Commissioner, T.C. Memo. 1970-85. This case is unlike Artnell in that here the fee is paid at the commencement of the performance by JFM. Performance, including incurring expenses, is not to begin at some future time, as in Artnell. Here, JFM likely began incurring substantial costs in its efforts locating a site, constructing, and leasing the Mart during the year the fee was received. Equally as important here, JFM deducted its costs regarding its efforts under the agreements in the year those costs were incurred and not upon the completion of the entire process of making a franchisee's Mart operational. [5]
*249 Finally, JFM has not provided sufficient evidence from which we could find that respondent abused her discretion in determining that JFM's method did not clearly reflect income. Accordingly, we find that JFM has not shown that its method of reporting the fees clearly reflected income and/or that respondent abused her discretion in requiring inclusion of fees in income in the year of receipt. B. Depreciation Class Life Category -- The parties differ regarding the category in which gasoline pump canopies and related assets should be classified. The use of ACRS and MACRS is mandatory for certain types of tangible depreciable assets which were placed in service after 1980. If property, mandatorily or by election, comes within this depreciation classification concept, the Secretary is authorized to prescribe allowable depreciation and the anticipated useful lives for various categories or classes of property for a particular industry or group of assets. See sec. 167. [6] Respondent has issued revenue procedures setting forth the prescribed categories. See Rev. Proc. 83-35, 1983-1 C.B. 745, and Rev. Proc. 87-56, 1987-2 C.B. 674. *250 If depreciable property does not fit within the specific classes designated by respondent, then it comes within the catchall provisions of section 168(c)(2)(B) for 1986 and section 168(e)(3)(C) for 1987 and is depreciable for 5 and 7 years, respectively. Respondent determined and argues that the canopies come within classification 57.1, which under either revenue procedure would result in a 20-year class life. Respondent alternatively argues that the canopies constitute improvements to land or realty and would fall within class 00.3, which would also result in a 20-year class life. JFM argues that the canopies do not come within the revenue procedure categories prescribed by respondent and that the depreciable lives are governed by the section 168 catchall provisions resulting in a 5-year class life for assets placed in service prior to 1987 and a 7-year class life for assets placed in service after 1986. Alternatively, if it is decided *251 that the catchall categories do not apply, JFM argues that the canopies fall within class 57.0 of the revenue procedures, which provides for a 9-year class life. The revenue procedures [7] contain the following definitions for guideline classes 57.0, 57.1, and 00.3: 57.0 Distributive Trades and Services: Includes assets used in wholesale and retail trade, and personal and professional services. Includes section 1245 assets used in marketing petroleum products. . . .
57.1 Distributive Trades and Services-Billboard, Service Station Buildings and Petroleum Marketing Land Improvements: Includes section 1250 assets, including service station buildings and depreciable land improvements, whether section 1245 property or section 1250 property, used in the marketing of petroleum and petroleum products, but not including any of these facilities related to petroleum and natural gas trunk pipelines. Includes car wash buildings and related land improvements. Includes billboards, whether such assets are section 1245 property or section 1250 property. Excludes all other land improvements, buildings and structural components as defined in section 1.48-1(e) of the regulations. . *252 . .
00.3 Land Improvements: Includes improvements directly to or added to land, whether such improvements are section 1245 property or section 1250 property, provided such improvements are depreciable. Examples of such assets might include sidewalks, roads, canals, waterways, drainage facilities, sewers * * *, wharves and docks, bridges, fences, landscaping, shrubbery, or radio and television transmitting towers. Does not include land improvements that are explicitly included in any other class, and buildings and structural components as defined in section 1.48-1(e) of the regulations. Excludes public utility initial clearing and grading land improvements as specified in Rev. Rul. 72-403, 1972-2 C.B. 102. . . .
*253 First, we cannot agree with JFM's argument that gasoline canopies do not fit within any of the categories of the revenue procedures and therefore must default to the catchall provisions of section 168. The specific definitions and classifications of guidelines 57.0 and 57.1 encompass gasoline pump canopies. Both guidelines include section 1245 and/or 1250 property "used in marketing petroleum products." [8] The evidence in this case places the canopies squarely with this definition. More specifically, the brand name, logos, and familiar colors of the products and companies are displayed. Additionally, the canopies provide shelter for the gasoline pumps and the customers to purchase the gasoline products. We reject JFM's argument that there is no suitable category in the revenue procedures. *254 In order to carry its burden of showing that 57.0 is the correct classification (9-year class life), JFM must show that the canopies are section 1245 property; otherwise the canopies would more aptly come with class 57.1 (20-year class life). Section 1245 property could come within class 57.1 if it is considered a land improvement. In order to be section 1245 property, the canopies must be "tangible personal property", as defined in section 1.48-1, Income Tax Regs. Sec. 1245(a)(3)(A); sec. 1.1245-3(b)(1), Income Tax Regs. "Tangible personal property" is defined in section 1.48-1(c), Income Tax Regs., in pertinent part, as follows: Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements *255 thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. * * * Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump * * * although annexed to the ground, shall be considered tangible personal property.
Stated in the vernacular of the investment credit statutes and regulations, we must decide whether the canopies are "buildings or inherently permanent structures." [9] As a matter of perspective, we note that the investment credit provisions promoted the purchase of tangible personal property by extending dollar for dollar tax credits. The question of whether property fits within the investment credit definitions was answered by an all or nothing response. Here, we consider the proper class life for property which is admittedly depreciable *256 and used in marketing petroleum products. This is a factual pursuit governed by the record in this case. Helpful criteria for resolving this question are contained in Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975), as follows: (1) Is the property capable of being moved and has it in fact been moved? * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e. are there circumstances which show that the property may or will have to be moved? * * * (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * * [Citations omitted.]
*257 To assist in our consideration of the canopies' classification, we will use the Whiteco Industries, Inc., supra, guidelines to focus on the facts of this case. We recognize that no one factor is necessarily decisive, but that each, to some extent, is probative. (1) Is the property capable of being moved and has it in fact been moved? The record here reflects that, although the canopies are large and becoming larger, they are modular, homogeneous, and portable. We are cognizant that the canopies are being placed on the land by lessees with a 15- or shorter-year lease term. Further, at least 2 of 14 had been sold to third parties for reuse, and at least 3 were taken down and either moved to another location or extensively rebuilt and reinstalled at the same location. In addition, the canopies may be expanded, contracted, and readily modified. For example, when the brand of oil changes, the old side panels are replaced with new panels containing the new logo, brand name, and/or color scheme. (2) Is the property designed or constructed to remain permanently in place?, and (3) are there circumstances that tend to show the expected or intended length of affixation; *258 i.e., are there circumstances which show that the property may or will have to be moved? We are cognizant that the canopies are being placed on the land by lessees with a 15- or shorter-year lease term. Once the initial 15-year lease ends, renewal leases are generally for 5-year terms. From the point of view of a lessee with a relatively short-term lease (in these instances from one-fourth to three-fourths as long as the 20-year class life of class 57.1), a truly permanent structure would not be cost effective. This is especially so where obsolescence has proven a factor. JFM's experience has been that the size of the gasoline facilities at the Marts has been increasing precipitously in the period preceding the tax years in question. In some instances, they have found it more economical to install new canopies, rather than to expand or modify existing ones. In addition, unpredictable weather conditions periodically require extensive replacement of panels and other components. (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"?; (5) How much damage will the property sustain upon its removal?; and (6) What is the *259 manner of affixation of the property to the land? Although the canopy components are collectively formidable, the whole structure can be erected and/or dismantled and moved in a few days. Moreover, the canopies have been dismantled, modified, and reinstalled and/or sold to third parties. The side panels are occasionally damaged, but most of the components are reusable. The entire canopy structure is bolted together from component beams and parts and attached to posts bolted onto four to six special concrete footings which are generally 3 feet deep and about 2 feet square. When the canopy is unbolted from the footings, the footings are the residual structures remaining on the land. Using the Whiteco Industries, Inc., supra, guidelines, we find that the canopies in this case are not "inherently permanent structures." We find that the canopies were readily movable and constructed so as not to be permanent. See Fox Photo Inc. v. Commissioner, T.C. Memo. 1990-348. Respondent, however, makes the further argument that the use of the term "land improvement" in class 57.1 would include any improvement to land even though *260 it may not be considered an "inherently permanent structure". Respondent draws upon class 00.3, which contains a broad definition of "land improvement". We reject respondent's approach for the same reasons we rejected JFM's attempt to classify the canopies in the catchall provisions of section 168. It is clear that classes 57.0 and 57.1 were intended to cover all possible types of real or personal property used in marketing petroleum products, whereas 00.3 is a catchall for otherwise unclassifiable improvements to realty. Although the actual life expectancy of an asset is not determinative of the asset class for depreciation, we acknowledge JFM's point that the actual life expectancy of the canopies is around 5 years because of wear and/or obsolescence. Even considering that canopies could last 10 or more years, it seems less appropriate that they would be classified as realty with a 20-year class life rather than as personalty with a 9-year class life. In this regard, JFM focused our attention on the conference committee report of the Tax Reform Act of 1986 which contains the following guidance to the executive branch in connection with the formulation of asset guidelines: *261 Any class life prescribed under the Secretary's authority must reflect the anticipated useful life, and the anticipated decline in value over time, of an asset to the industry or other group. Useful life means the economic life span of property over all users combined and not, as under prior law, the typical period over which a taxpayer holds the property. Evidence indicative of the useful life of property which the Secretary is expected to take into account in prescribing a class life includes the depreciation practices followed by taxpayers for book purposes with respect to the property. * * *
H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 42. Accordingly, we hold that petitioner's canopies for the tax years 1986 and 1987 should be classified under class 57.0 for purposes of their depreciable class life. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. The parties have stipulated to facts and exhibits for purposes of trial, and the parties' stipulations are, to the extent relevant, incorporated by this reference.↩
2. The $ 57,500 consists of two $ 25,000 territorial fees and three $ 2,500 initial store fees. It is not entirely clear whether the terms and conditions of the $ 2,500 initial store fees are the same as the $ 25,000 territorial fees, but the parties have treated them the same and we have found no reason to treat them differently.↩
3. Section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
4. Schlude v. Commissioner, 372 U.S. 128 (1963); American Automobile Association v. United States, 367 U.S. 687 (1961); Automobile Club of Michigan v. Commissioner, 353 U.S. 180 (1957); Hagen Advertising Displays, Inc. v. Commissioner, 47 T.C. 139 (1966); Decision, Inc. v. Commissioner, 47 T.C. 58 (1966); Farrara v. Commissioner, 44 T.C. 189↩ (1965).
5. It should be noted that the payments in Artnell Co. v. Commissioner, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), are more easily apportioned and matched to expenses because the payments there were for specific baseball games to be played pursuant to a fixed schedule. See also Chesapeake Financial Corp. v. Commissioner, 78 T.C. 869, 881 n.3 (1982), where Artnell↩ was similarly distinguished.
6. Former sec. 167(m)(1) was applicable for 1986 and sec. 167(m) for 1987.↩
7. Fortunately, Rev. Proc. 83-35, 1983-1 C.B. 747, 762, and Rev. Proc. 87-56, 1987-2 C.B. 677↩, 686, contain the same definition for the asset guideline classes 57.0 and 57.1.
8. Sec. 1245(a)(3) defines "section 1245 property" to include depreciable property which is either personal property or certain enumerated categories of real property. Sec. 1250(c) defines "section 1250 property" as any depreciable real property other than sec. 1245 property. It does not appear that gasoline pump canopies fall within any of the enumerated categories of real property afforded sec. 1245 property treatment.↩
9. We note that Rev. Rul. 68-345, 1968-2 C.B. 30↩, 32, specifically reaches the conclusion that "canopies installed over the pump islands of * * * gasoline stations" are "inherently permanent structures" for investment credit purposes. Respondent did not rely upon or reference this ruling in the original or reply briefs, even though petitioner discussed the ruling in its opening simultaneous brief. Because we do not consider a revenue ruling to have the effect of law, but merely to represent the position of respondent, as a party, we must assume that respondent's position in this case is the one presented on brief, which does not include the subject ruling.