T.C. Memo. 2004-118


UNITED STATES TAX COURT


PDV AMERICA, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PDV HOLDING, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12124-02, 12125-02.     Filed May 12, 2004.


<u>Lisa M. Cipriano</u>, <u>Michael A. Clark</u>, and <u>Kevin R. Pryor</u>, for
petitioners.

<u>C. Glenn McLoughlin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:  Respondent determined deficiencies with
respect to petitioners' income tax as follows:

Docket No. 12124-02

Year        Deficiency

1996        $119,774

Docket No. 12125-02

Year        Deficiency

1997        $218,170

Petitioners timely filed petitions contesting respondent's
determinations.  Upon motion of the parties, these cases were
consolidated for purposes of trial, briefing, and opinion.

After concessions,[1] the issue for decision is whether
certain aboveground storage tanks located at petitioners' refined
product terminals are included in Modified Asset Cost Recovery

---

[1]Respondent conceded that the following aboveground storage
tanks are included in Modified Asset Cost Recovery System (MACRS)
Asset Guideline Class 57.0, Rev. Proc. 87-56, 1987-2 C.B. 674,
686:

| Terminal location | Tank No. |
| --- | --- |
| Albany, N.Y. | 51 |
| Brownsville, Tex. | 5 |
| Milwaukee, Wis. | 8, 9 |
| Mt. Prospect, Ill. | 10, 11, 12 |
| Niceville, Fla. | 3 |
| San Antonio, Tex. | 104, 105, 106, 107, 111 |
| Spartanburg, S.C. | 7 |
| Vestal, N.Y. | 6 |

These tanks had shell capacities of 5,000 barrels or less,
heights of 35 feet or less, and diameters of 35 feet or less.

In addition, the parties agree that the class lives for the
Pittsburgh, Pa., terminal's tanks at issue will be the same as
the class life determined with respect to tank No. 1 at the
Chesapeake, Va., terminal.

System (MACRS) Asset Guideline Class 57.0 of Rev. Proc. 87-56, 1987-2 C.B. 674, 686, and treated as 5-year property under section 168(e)(1),[2] or are included in MACRS Asset Guideline Class 57.1, and treated as 15-year property under section 168(e)(1).

## FINDINGS OF FACT

Some of the facts have been stipulated. We incorporate the stipulation of facts and the supplemental stipulation of facts into our findings by this reference.

PDV Holding, Inc., and PDV America, Inc., are Delaware corporations. PDV Holding, Inc., was created in 1997 as the new common parent of the PDV America, Inc., affiliated group. Accordingly, we shall refer to PDV Holding, Inc., and PDV America, Inc., collectively as petitioner.

Petitioner timely filed consolidated Forms 1120, U.S. Corporation Income Tax Return, for the taxable years 1996 and 1997 on behalf of itself and its affiliated corporations. Petitioner's principal office was located in Tulsa, Oklahoma, when it filed the petitions.

A. CITGO's Business

Petitioner's subsidiary, CITGO Petroleum Corp. (CITGO), a

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

Delaware corporation, operates the refined petroleum product terminals at issue. CITGO is the eighth largest crude oil refiner in the United States, with ownership interests in four United States gasoline and distillate refineries. CITGO's refined products include gasoline, diesel fuel, kerosene, and jet fuel. CITGO is also a transporter and marketer of petroleum and refined petroleum products.

As a gasoline marketer, CITGO's operation is the fourth largest in the United States and includes gasoline products such as regular unleaded, premium unleaded, and various special formulations of gasoline for particular markets with environmental emission restrictions. CITGO sells its branded gasoline through independently owned and operated branded marketers and also sells unbranded gasoline to independent distributors.

In order to move its refined fuel products from the refineries to the ultimate consumer, CITGO maintains an extensive distribution system of pipelines and terminals.[3] Terminals provide temporary storage for gasoline and other refined products received from nearby refined product pipelines and/or waterways[4]

---

[3]CITGO Petroleum Corp. (CITGO) also uses this system to distribute refined products on behalf of others in exchange for transportation and storage fees.

[4]Barges transport refined products across waterways to the terminals.

before CITGO distributes the products to other terminals, branded retail outlets, or bulk customers. CITGO has ownership interests in 55 terminals. During 1996 and 1997, except for two terminals which CITGO operated under long-term ground leases, CITGO's terminals were located on land that CITGO held in fee simple.

B. CITGO's Aboveground Storage Tanks

At its terminals, CITGO uses aboveground storage tanks (tanks) for the storage, marketing, and distribution of petroleum and petroleum products. CITGO owns more than 500 tanks. One hundred and four of those tanks are at issue in this case and vary in size from shell capacities of 7,000 to 194,000 barrels.[5] The tanks at issue also range in height from 22 feet to 57 feet and 2 inches and range in outside diameter from 40 feet to 170 feet. Some tanks have been in existence for over 60 years.

Typically, tanks are composed of a shell made of welded or riveted steel plates, a steel floor,[6] a fixed or floating roof,[7] and accessories, such as ladders. Other than internal roof and

---

[5]Shell capacity refers to the internal volume of the aboveground storage tank (tank) shell and is usually measured in barrels.

[6]The tank floor functions as a membrane to prevent the petroleum product's leaking from the tank base.

[7]As a method for cutting down on vapor emission, some tanks have internal floating roofs that float on top of the gasoline and move up and down as gasoline is pumped into or out of the tank. An open-top, floating-roof tank has no external roof structure.

rafter support columns, the tanks contain no internal superstructure, and their external plating provides the sole structural support.  The tank shell is thickest at the bottom and gradually thins toward the top, which makes the center point of the tank's total weight lower than half the tank height.

Due to the amount of steel in the tanks' composition, the tanks have considerable weight.  For example, a 55,900-barrel tank has a dry weight of 394,000 pounds, and a 151,000-barrel tank exceeds 1 million pounds.  Consequently, tanks usually are not tied down to their foundations, and none of CITGO's tanks are.

The purpose of tank foundations is to spread the tank's weight load to help avoid tank settlement and to keep moisture and other corrosive elements from deteriorating the tank's steel structure.  Tank foundations may consist of compacted sand or soil, concrete ringwalls, crushed stone ringwalls, or concrete slabs.  For sand pad foundations, CITGO replaces the top 3 to 6 inches of the soil with sand or granular backfill.  Concrete ringwalls are circular concrete walls from 12 to 18 inches thick that line up with the tank's outer edge.  The ringwall is mostly beneath grade and is filled with sand or other material to permit sufficient drainage.  Similarly, crushed stone ringwalls are circular gravel rings filled with sand or other drainage material.  Concrete slab foundations are more infrequently used

and have a thickened edge or reinforced concrete piles on the edge to help bear the weight of the tank.

C.   Tank Construction

When a terminal requires the addition of new tanks, management personnel at the terminal first prepare an authorization for expenditure (AFE).  After approval of the AFE, CITGO submits requests for bids from tank builders, reviews the bids, and awards a contract.  CITGO's contracts require that the tank's design and construction comply with the American Petroleum Institute Standard 650, Welded Steel Tanks for Oil Storage (API Standard 650).  The contractor then prepares drawings according to the contract specifications and fabricates the various tank components.

Once the tank foundation is built, the contractor sets and welds together the tank floor.  Then, the contractor welds the steel plate tank shell rings from the floor up to the top ring. At this point, the contractor installs any necessary roof support columns, girders, or rafters and any internal mechanisms, such as an internal floating roof.  Finally, after welding the roof plating together, the contractor installs ladders or other accessories and paints the tank.

The cost of constructing a new tank is between $10 and $12 per barrel of capacity.  Tank construction crews usually consist of 8 to 12 workers, who build the tank structure in 5 to 6 weeks.

A concrete ringwall foundation requires an additional 1 to 2 weeks of construction.

During 1996 and 1997, CITGO placed in service the following seven new tanks: Tanks Nos. 500, 501, 502, and 505 at the Linden-Tremley, New Jersey, terminal; tanks Nos. 3 and 6 at the Braintree, Massachusetts, terminal; and tank No. 9 at the Vicksburg, Mississippi, terminal. The seven new tanks were built on top of concrete ringwall foundations filled with sand.

At the Linden-Tremley terminal, CITGO's contractor, Pitt-Des Moines, Inc., agreed to construct tanks Nos. 501 and 502[8] for $1,244,750. CITGO hired Simpson and Brown, Inc., to construct both foundations for $86,000. The total amount CITGO expended to construct tanks Nos. 501 and 502 was $1,884,623.[9]

Pitt-Des Moines, Inc., also constructed tanks Nos. 3 and 6[10] at the Braintree terminal for a price of $1,028,466. For the

---

[8]Tanks Nos. 501 and 502 at the Linden-Tremley terminal are 48-foot-tall tanks with diameters of 117 feet, double bottoms, cone roofs, and internal floating roofs.

[9]The record does not indicate the exact amount that CITGO paid for the construction of tanks Nos. 500 and 505 and their respective foundations at the Linden-Tremley terminal. However, the total amounts CITGO expended were $935,002 for tank No. 500 and $799,157 for tank No. 505. Both tanks are approximately the same size as tanks Nos. 501 and 502.

[10]Tanks Nos. 3 and 6 at the Braintree terminal are 45-foot-tall, cone-roof tanks, with diameters of 125 feet.

construction of the tanks' foundations, CITGO paid Louis T. Pompeo & Son, Inc., $105,709.  The total amount CITGO expended for the project was $1,644,532.

At the Vicksburg terminal, CITGO's contractor, Baker Tank Co./Altech, constructed tank No. 9[11] for $271,126.  The record does not indicate how much CITGO paid for the construction of the foundation.  The total amount CITGO expended for the project was $439,506.

D.  Tank Corrosion, Inspection, and Repair

Because steel tends to rust, tank corrosion is inevitable. In extreme corrosion cases, a pit will develop in the steel plates and lead to leakage.  Additionally, tank foundations may settle at different levels under a tank, creating stress on the tank shell and causing the tank to lose its original shape.  In order to combat these problems, CITGO has an extensive program to prevent and monitor corrosive damage to the tanks and to monitor structural problems due to foundation settlement.

Pursuant to its inspection program, at least every 10 years, CITGO cleans and inspects each tank.  CITGO conducts inspections visually and with electronic devices that gauge the floor plate depth.  In some cases, CITGO lifts the tanks into the air to provide a better view of the tank bottom or to inspect the tank

---

[11]Tank No. 9 at the Vicksburg terminal is approximately 49 feet tall, with a cone roof, an internal floating roof, and a diameter of 67 feet.

foundation.  In accordance with Environmental Protection Agency (EPA) air emission permit requirements, CITGO annually inspects the tanks' external and internal floating roof seals and, every 10 years, inspects the external and internal floating roof mechanisms.  CITGO's tank inspection schedule is also designed to comply with American Petroleum Institute Standard 653, Tank Inspection, Repair, Alteration, and Reconstruction (API Standard 653).

Repairing corroded tank floors may involve patching or replacing the corroded floor plates or completely replacing the tank floor.  In some cases, the tanks are lifted off the ground in order to repair the floor underside or to perform foundation repairs.  For example, CITGO has lifted tanks Nos. 2 and 3 at the Vestal, New York, terminal in order to perform foundation repairs.  When performing foundation repairs, lifting the tank off the ground allows the tank to return to its normal shape. If refined product leakage has occurred, soil remediation may be accomplished by lifting the tank, removing the sand underneath, and replacing the tainted soil with clean soil or, instead of lifting the tank, by cutting out the tank floor in order to reach the soil below it.

E.  Tank Relocations

In addition to lifting tanks for repair purposes, tanks also are lifted in order to relocate them either within the same

terminal or to a different terminal.  Tank relocations occur for various reasons, such as returning leased land back to the owner, making room for facility expansions, moving tanks closer to the pumping and loading facility, or moving tanks onto a new site. Tank relocations may involve one or more of the following methods:  The hovercraft technology, the Watson Air Bag technology, standard trucks and semitrailers, railway tracks and railway bogies, load skates and steel I beams, truck crawler units powered by hydraulics, helicopters,[12] barges, floating tanks in water like a ship,[13] and dismantling the tank for reconstruction at the new location.  Ultimately, the amount of time required to perform a tank relocation depends on the method chosen and the conditions at the site.

1.  <u>The Hovercraft Technology</u>

The hovercraft technology, or "air lift method", relocates fully assembled storage tanks.  A crew of seven people can perform the relocation using this method.  First, the tank must be cleaned and disconnected from any gauges and piping, and anchoring devices must be welded to the tank.  Second, the site route is prepared to assure that it is level.  Next, the crew

---

[12]Due to a 20-ton weight limit, helicopters can move only small tanks.

[13]A large tank will float in water between 18 and 24 inches deep.  This relocation method is limited to short distances, for example, across harbors.

attaches a flexible skirt to the bottom of the tank.  Large diesel-powered air compressors pump air under the tank, lifting the tank off the ground as much as 18 inches.  Finally, tractors pull the tank to its new location.  Disconnection from the gauges and piping, ground preparation, air lift relocation, and reconnection to the gauges and piping system all can be performed in 1 to 2 weeks.

Although the hovercraft is an effective method for relocating tanks intact, the technology has some limitations. Unless the tank rests on a dry, level foundation, and grade changes do not exceed 2 to 3 percent, the flexible skirt will fold under.  Additionally, because three machines hold the tank, the tank shell may be pulled a little out of shape.

2.  The Watson Air Bag Technology

Similar to the hovercraft technology, the Watson Air Bag technology relocates tanks intact.  The tank lifting equipment is portable and can be carried to the tank site by one worker.  In order to keep a tank in service as long as possible, before lifting and moving the tank from its old site, the new foundation is built at the tank's new site.

Briefly, the Watson Air Bag technology relocation procedure involves (1) inflating air bags placed under the tank until the tank reaches the desired elevation; (2) connecting the tank to the preferred method of relocation, such as railway track and

bogies or H-beams and load skates; and (3) once at the new site, reversing the process and lowering the tank onto its new foundation. The entire lifting, moving, and lowering process can be completed in 1 week. For a tank with a diameter of 80 feet, a crew of four people can perform the initial lifting process in approximately 8 hours.

When relocating tanks using the Watson Air Bag technology, significant damage to a tank is unlikely. Tanks are lifted between 3 and 5 feet above the ground. Although a section of the tank could fall and hit the ground, any damage from such a fall is repairable. In some cases, the cost to move the tank intact is only 30 percent of the cost to cut the tank down and reconstruct it at the new site.

3. Dismantling and Reconstruction

API Standard 653 provides procedures for dismantling and reconstructing welded tanks for relocation from their original site. When dismantling the tank, API Standard 653 recommends marking the shell, bottom, and roof plates for easy identification. If properly followed, the specifications of API Standard 653 will produce a tank with an "acceptable appearance and structural integrity".

A crew of 8 to 10 people can dismantle and reconstruct a tank. First, cranes hold the steel plates in place as the tank is cut apart with torches or other cutting devices. Then, the

crew loads the pieces onto trucks and hauls them. Next, the crew performs beveling work on the plate edges to prepare for welding them back together. Finally, the crew rebuilds the tank using the same procedure as used for new tank construction. See supra p. 7. The cutting and loading jobs can be performed in about 1 week, on top of the 5 to 6 weeks for reconstruction at the new site.

One possible problem when using this method to relocate tanks is that, when a tank is put back together, the steel may not return to its previous shape. In addition, Government-imposed highway weight restrictions may limit the use of this relocation method. For example, the Federal allowable highway weight load is 90,000 pounds, which includes the truck's weight.

4. Other Tank Relocation Issues

In addition to weight restrictions, other highway-related restrictions, including width and height restrictions, may make it difficult to transport tanks, particularly when the tanks are intact. However, because most terminal facilities are located on water or near water, it is possible to move a tank via barge instead. In contrast to highway tank relocations, barge relocations are a much less restrictive method, even though, in some cases, bridges over waterways could create height and width obstacles.

When relocating intact tanks with internal roof support columns, the contractor must install internal bracing to support the floor and the roof.[14] The internal bracing consists of a steel pipe frame between the tank roof support columns that transfers the tank's weight to the shell. Without the internal bracing the tank roof could fall down or the tank floor could invert during the lifting process.

5. Past Relocations of CITGO's Tanks

Since 1993, CITGO has relocated two tanks.[15] In 1993, CITGO hired a professional tank lifter, Frank W. Hake, Inc., to relocate tank No. 44 at the East Chicago terminal approximately 1,000 feet using the hovercraft technology. Tank No. 44 was a 55,000-barrel tank, with a height of 46 feet and a diameter of 92 feet. CITGO relocated tank No. 44 in preparation for the transfer of the land to its former owner, Occidental Petroleum Corp., for remediation of environmental hazards. Two other smaller tanks were cut down and sold for scrap.

CITGO cannot substantiate the amount it paid to Frank W. Hake, Inc., to perform the relocation of tank No. 44 but estimated that the cost was $75,000. This estimate does not

---

[14]If the tank is only lifted off the ground, but not moved, the internal bracing may not be necessary. Instead, the shell can be lifted separately from the tank floor and tank roof under each roof support column.

[15]During the years at issue, CITGO did not make additions or improvements to these tanks.

include any costs related to the preparation of a path for the relocation or the construction of a new concrete ringwall foundation. The relocation itself took approximately 4 hours.

In 1994, CITGO relocated a 30,000-barrel tank from Austin, Texas, to the Vicksburg terminal, a distance of approximately 550 miles. The tank was 40 feet high with a diameter of 73 feet and became known as tank No. 2. Baker Tank Co. performed the relocation using the dismantling and reconstruction method. CITGO relocated the tank in anticipation of closing its Austin terminal due to local opposition to its operation after an environmental problem arose at another oil company's terminal. Three other tanks were sold for scrap.

According to CITGO's contract with Baker Tank Co. for the relocation of Vicksburg tank No. 2, the cost of the relocation was $234,856. The price included the installation of a second tank bottom, an internal floating roof, and accessories.

F. The Tank Improvements at Issue

In 1996 and 1997, CITGO spent $13,075,824 and $803,489, respectively, on the construction of new tanks and additions or improvements to existing tanks. CITGO capitalized the expenditures for its books and records. Petitioner depreciated the expenditures using the MACRS recovery rates prescribed in Rev. Proc. 87-56, 1987-2 C.B. 674, 686, for Asset Guideline Class

57.0 (asset class 57.0) property eligible for a 5-year recovery period.

On May 2, 2002, respondent sent petitioner separate notices of deficiency. In the notices of deficiency, respondent determined that the 1996 and 1997 expenditures were eligible for a 15-year recovery period under MACRS Asset Guideline Class 57.1 (asset class 57.1).

On July 22, 2002, petitioner filed separate petitions with this Court on behalf of all eligible members of the affiliated group of which petitioner was a common parent. In its petitions, petitioner alleged that respondent:

> erroneously disallowed [the] depreciation deductions
> * * * by erroneously classifying [the tanks] as "land
> improvements" designated as asset class 57.1 * * *
> rather than as "section 1245 assets used in marketing
> petroleum and petroleum products" designated as asset
> class 57.0 * * *

OPINION

Section 167(a)(1) permits a depreciation deduction for the exhaustion and wear and tear of property used in a trade or business. In the case of tangible property, the rules of section 168 will determine the proper depreciation deduction. See secs. 167(b), 168(a). Section 168(e) places property into categories on the basis of the property's class life, which categories are then used to determine the applicable recovery period under section 168(c).

Rev. Proc. 87-56, 1987-2 C.B. 674, 686, sets forth the class lives to be used when computing depreciation allowances under section 168. Asset class 57.0, entitled "Distributive Trades and Services", assigns a 5-year recovery period to "section 1245 assets used in marketing petroleum and petroleum products". Asset class 57.1, entitled "Distributive Trades and Services-- Billboard, Service Station Buildings and Petroleum Marketing Land Improvements", assigns a 15-year recovery period to "section 1250 assets, including * * * depreciable land improvements, whether section 1245 property or section 1250 property, used in the marketing of petroleum and petroleum products". Section 1245 property includes storage facilities used in connection with the distribution of petroleum and petroleum products. Sec. 1245(a)(3)(E).

Both parties agree that the tanks are used in the marketing and distribution of petroleum and petroleum products and, therefore, should be classified under either asset class 57.0 or asset class 57.1. The parties also agree that, in order to properly classify the tanks, we must decide whether the tanks constitute inherently permanent structures using the six factors articulated in Whiteco Indus., Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975). Petitioner concedes that section 7491 does not apply to shift the burden of proof to respondent. See also Rule 142(a)(1).

In JFM, Inc. & Subs. v. Commissioner, T.C. Memo. 1994-239, this Court concluded that gasoline canopies used in marketing petroleum products were not "land improvements" within the meaning of asset class 57.1 and should be classified under asset class 57.0. To determine the proper characterization of the canopies, we considered whether the canopies were inherently permanent structures. We applied the following six factors articulated in Whiteco Indus., Inc. v. Commissioner, supra at 672-673:

> (1) Is the property capable of being moved, and has it in fact been moved? * * *
>
> (2) Is the property designed or constructed to remain permanently in place? * * *
>
> (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? * * *
>
> (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? * * *
>
> (5) How much damage will the property sustain upon its removal? * * *
>
> (6) What is the manner of affixation of the property to the land? * * * [Citations omitted.]

In addition, we observed that, although no single Whiteco factor is decisive, each factor is probative to some extent. JFM, Inc. & Subs. v. Commissioner, supra.

Petitioner contends that the tanks are not inherently permanent structures. According to petitioner's application of

the Whiteco criteria, each factor favors petitioner's position. In direct contrast, respondent contends that each Whiteco factor supports respondent's position that the tanks are inherently permanent structures. Our analysis of the Whiteco factors and the parties' arguments regarding them follow.

A.  Is the Property Capable of Being Moved, and Has It in Fact Been Moved?

Although CITGO has moved tanks in the past, and Alan R. Watson,[16] creator of the Watson Air Bag technology, testified as an expert on tank lifting and relocation, respondent maintains that the tanks do not satisfy this Whiteco factor. Respondent argues that the tanks can be moved intact only within the same terminal or onto an adjacent property and that relocating tanks over long distances requires cutting the tanks into pieces. According to respondent, this type of movement is not Whiteco "movement".

In Whiteco Indus., Inc. v. Commissioner, supra at 672, we did not provide a definition for the term "movement" but concluded that this factor was "clearly" satisfied because the outdoor advertising signs had in fact been moved. As support for our conclusion, we cited Estate of Morgan v. Commissioner, 52 T.C. 478, 483 (1969), affd. per curiam 448 F.2d 1397 (9th Cir.

[16]Alan R. Watson is president of A.R. Watson USA, LLC, and is also employed by his New Zealand company, A.R. Watson, Ltd. A.R. Watson USA, LLC, markets the concept of tank lifting and performs tank lifts and relocations.

1971), a case in which evidence of "movement" included relocations of floating docks to new sites within the same basin, where they remained "part of the same complex of floating docks". See also Scott Paper Co. v. Commissioner, 74 T.C. 137, 144-145, 170-171 (1980) (primary electric components relocated within the same facility treated as movable); Moore v. Commissioner, 58 T.C. 1045, 1048, 1052 (1972) (mobile homes relocated within the same park treated as movable), affd. per curiam 489 F.2d 285 (5th Cir. 1973).

Even though CITGO has not relocated tanks intact over long distances, the tanks are capable of such movement, contrary to respondent's contention. In his expert report and at trial, Mr. Watson described tank relocations that he has performed with the tanks intact. Mr. Watson testified that he relocated one tank in Alaska a distance of 55 miles and relocated three tanks in New Zealand approximately 200 miles.[17]

We also disagree with respondent that the tanks must remain intact when relocated. Respondent does not direct us to, and we are unaware of, any case law establishing such a requirement. Moreover, in JFM, Inc. & Subs. v. Commissioner, supra, the gasoline canopies were dismantled before they were relocated.

---

[17]We find unpersuasive respondent's attempts to distinguish these relocations because they did not occur in the "continental United States".

Petitioner has demonstrated that the tanks are capable of being moved and have in fact been moved.  Consequently, this factor favors petitioner.

B.  <u>Is the Property Designed or Constructed To Remain Permanently in Place?</u>

Petitioner contends that the tanks' design and construction demonstrate that the tanks are not to remain permanently in place.  According to petitioner, CITGO designed and constructed the tanks in conformity with industry standards, which enables CITGO to dismantle the tanks and reconstruct them at new sites pursuant to API Standard 653 or relocate them intact with the Watson Air Bag technology.[18]

In contrast, respondent contends that the tanks were not designed to be moved to new locations but, instead, were designed to remain in place for their entire economic useful lives.  Comparing the tanks to the property at issue in cases such as <u>Whiteco Indus., Inc. v. Commissioner</u>, 65 T.C. 664 (1975) (outdoor advertising signs); <u>JFM, Inc. & Subs. v. Commissioner</u>, <u>supra</u> (gasoline canopies); and <u>Fox Photo, Inc. v. Commissioner</u>, T.C. Memo. 1990-348 (1-hour photo labs), respondent asserts that the tanks are significantly different for the following reasons:  (1)

---

[18]Petitioner attached to its posttrial brief a document purportedly describing European tank-moving standards. Petitioner did not submit this document at trial.  Consequently, the document is not part of the record, and we disregard it.  See Rule 143(b); <u>Lombard v. Commissioner</u>, T.C. Memo. 1994-154 n.3, affd. without published opinion 57 F.3d 1066 (4th Cir. 1995).

The tanks are massive in size and have economic useful lives of 60 to 70 years, and (2) AFEs for building new tanks at terminals do not reflect an intent to relocate the new tanks at some later date.  In addition, respondent argues that the need for internal bracing when relocating intact tanks with internal roof support columns demonstrates that the tanks were designed to remain permanently in place.

In Whiteco Indus., Inc. v. Commissioner, supra at 672, we concluded that the outdoor advertising signs were "not designed or constructed to last permanently."  The signs were designed to last only for the duration of the advertising contract, about 5 years, at which time the signs would require "substantial renovation", including a new sign face and various repairs.  Id. We did not require the taxpayer to show that the taxpayer actually intended to relocate the property at a later date.  Id.; see also JFM, Inc. & Subs. v. Commissioner, T.C. Memo. 1994-239 (same).

Although the property at issue in the present case is quite large, for this second Whiteco factor, the focus of our inquiry is on the permanence of the property's design and construction. The property's size is not determinative.  See, e.g., Estate of Morgan v. Commissioner, supra at 480 (floating docks at issue had one walkway that was approximately 290 feet long).

We also disagree with respondent's contention that property with a relatively long economic useful life is necessarily designed to remain permanently in place. In Estate of Morgan v. Commissioner, 52 T.C. at 481, 483, where the floating docks had an estimated useful life of 20 years, or longer with periodic part replacements, we concluded that the floating docks were not inherently permanent. Similarly, in Film N' Photos, Inc. v. Commissioner, T.C. Memo. 1978-162, the photo merchandising huts at issue were not inherently permanent, even though they could remain at the same location for 20 years or more and had a useful life of 50 years or more. See also Fox Photo, Inc. v. Commissioner, supra (1-hour photo labs had an estimated useful life of 50 years but were not designed to remain permanently in place).

Respondent further asserts that the internal roof support columns in the tanks reflect permanence. When relocating an intact tank with internal roof support columns, internal bracing is required to support the tank floor and roof. The bracing is not part of the tank's design and must be added to a tank before moving it. However, when using the dismantling and reconstruction procedures for relocating tanks in API Standard 653, the internal bracing is not necessary.

In Fox Photo, Inc. v. Commissioner, supra, the 1-hour photo labs' steel frames were reinforced beyond regular support

requirements so that the lab halves could be moved without collapsing. We concluded that the labs were not constructed to remain permanently in place. Id. Fox Photo, Inc. is distinguishable from the present case, however, because CITGO's tanks have no internal superstructure. We cannot agree that, by constructing the tanks without the otherwise structurally unnecessary internal bracing, particularly when the bracing is not needed to relocate tanks pursuant to API Standard 653, petitioner constructed the tanks to remain permanently in place.

When CITGO designs and constructs its tanks, CITGO does so in compliance with API Standard 650. Pursuant to API Standard 653, tanks constructed according to API standards can be dismantled and then reconstructed at a new site. In addition, as Mr. Watson testified, tanks built to API Standards also can be lifted and moved using the Watson Air Bag technology. Clearly, such tanks are not designed or constructed to remain permanently in one place. This factor favors petitioner.

C. Are There Circumstances Which Tend To Show the Expected or Intended Length of Affixation, i.e., Are There Circumstances Which Show That the Property May or Will Have To Be Moved?

Petitioner concedes that, when CITGO places new tanks in service, CITGO does not intend to move the tanks immediately. However, petitioner contends that it is foreseeable that CITGO may have to move the tanks for maintenance, environmental remediation, or various business or economic reasons. First,

petitioner argues that CITGO may need to move a tank by lifting it off the ground in order to repair corrosion of the steel plates on the tank's underside.  Petitioner also asserts that the least intrusive method for replacing contaminated sand underneath a tank involves moving the tank, either by suspending the tank in the air or temporarily moving the tank off its foundation, to the side.  Furthermore, petitioner argues, possible changes in terminal demand may lead to the sale or closing of terminals or the sale of tanks, scenarios in which it is reasonably likely that CITGO may have to move tanks.

On the other hand, respondent contends that the tanks' ages, their location on fee simple land, and CITGO's attempts to extend their useful lives with extensive maintenance and repairs demonstrate that CITGO intended to keep the tanks in place permanently.  Respondent also asserts that CITGO's two prior tank relocations for environmental reasons were unusual occurrences and do not demonstrate "any real likelihood" that CITGO may have to move a tank.

In Whiteco Indus., Inc. v. Commissioner, 65 T.C. at 672, we concluded that the taxpayer "[did] not intend, nor could it realistically expect, the signs to remain permanently in place." We observed that the taxpayer was aware that "numerous situations" could arise which would necessitate moving the signs either before or after the expiration of the taxpayer's contract

with advertisers.  Id.  Examples of such situations included the leased land's owner's refusing to renew the lease, a change in the location of the road, or some other event that would make the sign's position undesirable.  Id.

Scott Paper Co. v. Commissioner, 74 T.C. at 172, in which we held that primary electric components were not inherently permanent structures, provides another example of circumstances which tend to show that property may or will have to be moved. In Scott Paper Co., this Court acknowledged that changes in power demands could arise that would require the taxpayer to move the primary electric components and modify them to accommodate those new demands.  Id. at 171.  Indeed, when such changes in demand had occurred in the past, the taxpayer had relocated components within the facility.  Id. at 144-145, 171.

Although some of CITGO's tanks have been in existence for more than 60 years, and, for the most part, the tanks were not situated on leased land,[19] we do not think that petitioner could realistically expect the tanks to remain permanently in place. After considering all of the evidence, we agree with petitioner that, when dealing with refined products, it is reasonably likely

---

[19]Whether the taxpayer owned or leased the land on which the property was located is not determinative for purposes of this factor.  In Scott Paper Co. v. Commissioner, 74 T.C. 137, 144 (1980), we held that a part of the electrical distribution system of a pulp and paper making plant was not an inherently permanent structure, without even addressing whether the taxpayer owned the land on which the plant was located.

that an environmental problem may arise, which would require CITGO to move the tanks. In some cases, CITGO may need to move a tank only temporarily in order to replace the contaminated sand underneath the tank. In other cases, however, as the circumstances surrounding CITGO's past tank relocations demonstrate, CITGO may need to permanently remove a tank from one site and place it at a different terminal.

In addition to environmental reasons for moving tanks, CITGO may need to move tanks within a terminal for economic reasons, such as to make room for terminal expansions, bring tanks closer to pumping and loading facilities, or maximize terminal facilities by joining tank farms together. We disagree with respondent that the maintenance and repair work CITGO has performed on the tanks negate the possibility that the tanks may have to be moved. In order to keep the tanks in compliance with EPA and industry standards, CITGO must perform maintenance and make required repairs. This factor favors petitioner.

D. <u>How Substantial a Job Is Removal of the Property and How Time-Consuming Is It?  Is It "Readily Removable"?</u>

According to petitioner, removing the tanks is not a substantial, time-consuming job. Petitioner concedes that removing the tanks is a more "involved" process than removing outdoor advertising signs, 1-hour photo labs, or gasoline canopies but contends that removing the tanks is relatively no more difficult. Respondent disagrees, arguing that the tanks are

not readily removable due to the amount of time required to complete the relocation process; the height, weight, and width limitations related to transporting tanks on highways or across waterways; and the complexity of the relocation procedures.

In Whiteco Indus., Inc. v. Commissioner, supra at 673, we described the disassembly and removal of the taxpayer's outdoor advertising signs as a "relatively quick and easy process." Although the record in Whiteco did not indicate the full amount of time required to complete the process, we concluded that, on the basis of the known time and effort involved, the signs were readily removable. Id.; see also Film N' Photos, Inc. v. Commissioner, T.C. Memo. 1978-162 (photo merchandising units could be removed "in a relatively short time").

With respect to the gasoline canopies in JFM, Inc. & Subs. v. Commissioner, T.C. Memo. 1994-239, although we acknowledged that the components were "collectively formidable", we observed that the canopies could be erected or dismantled and moved in a few days.[20] We also noted that the gasoline canopies had in the past been dismantled, modified, and reinstalled or sold to third parties. Id.

---

[20]Specifically, a gasoline canopy could be installed by a crew of four in 3 days and dismantled by a crew of three in 2 days. JFM, Inc. & Subs. v. Commissioner, T.C. Memo. 1994-239.

When relocating tanks intact, in addition to the time required to remove the tanks physically from their original sites, more time may be needed for one or more of the following reasons: (1) Internal bracing must be installed before moving certain tanks intact, which, for a 180-foot diameter tank, requires 4 to 5 days; (2) building a new concrete ringwall foundation takes approximately 1 to 2 weeks; (3) the tanks and/or the terminals may require certain modifications or repairs before or after installation of the tanks at the new site; and (4) the new site may be several miles away. We disagree with respondent that, in our determination of whether the tanks are readily removable, we should consider the time required for these additional steps.

In Whiteco, JFM, and similar cases, we limited our application of this factor to the job of removing the property from its original site. Indeed, in cases in which we had the opportunity to incorporate the time required for related preparatory work, repair work, or travel, we did not do so. See Standard Oil Co. (Ind.) v. Commissioner, 77 T.C. 349, 372-373, 409 (1981) (excluded travel time when determining whether service station signs and lighting facilities were readily removable); Scott Paper Co. v. Commissioner, supra at 172 (focused on how much time was required to "move" the components rather than how long it would take to make them "operational" at the new site if

2 months of preparatory work had not been performed ahead of time); Fox Photo, Inc. v. Commissioner, T.C. Memo. 1990-348 (excluded the time required to restore the old site to its original condition and to repair and refurbish the 1-hour photo labs for reuse and, instead, focused on time required to remove the labs from their location). Because the consideration of travel time is not appropriate for this factor, we also decline to consider the height, weight, and width restrictions that may arise when transporting the tanks on certain roads or over certain waterways.

The record is not entirely clear with respect to the amount of time required for removal of the tanks using the various tank relocation methods. For example, the 1- to 2-week time estimate for moving tanks with the hovercraft technology includes time spent on work to make the tanks operational at the new site. As demonstrated by CITGO's relocation of East Chicago tank No. 44, however, when the hovercraft technology is properly used, small to medium size tanks can be removed from their original sites in approximately 4 hours, a shorter amount of time than the 2 days required to remove the gasoline canopies in JFM, Inc. & Subs. v. Commissioner, supra, and the 12 to 18 hours required to remove the 1-hour photo labs in Fox Photo, Inc. v. Commissioner, supra. Similarly, for the Watson Air Bag technology, the record indicates that crews will require about 1 week for the entire

relocation but is silent as to the amount of time required to remove a tank using that method. The record does show that with the dismantling and reconstruction method described in API Standard 653, a crew can remove the tank in about 1 week.

Although the removal of tanks with these methods has the potential to require more time and larger crews than the removal of other types of property at issue in past cases, we do not think that the time and crew requirements for removing tanks are too substantial. Moreover, petitioner has demonstrated that it is possible to remove tanks in a relatively short amount of time. We also cannot agree with respondent that the complex procedures for removing tanks, which are carried out by professionals familiar with the technology, render the job too substantial.

On the basis of the foregoing, this factor favors petitioner.

E. How Much Damage Will the Property Sustain Upon Its Removal?

In Whiteco Indus., Inc. v. Commissioner, 65 T.C. at 673, we observed that "much" of an outdoor advertising sign was not damaged upon its removal. We also noted that a sign's removal generated no wastage, except for the portion of the poles surrounded by concrete, and, if the sign was removed at the end of an advertising contract, the sign face was replaced. Id.

When we applied this factor in JFM, Inc. & Subs. v. Commissioner, supra, we concluded that occasional damage to the gasoline canopies' side panels upon removal was acceptable because "most of the components [were] reusable."  In Film N' Photos, Inc. v. Commissioner, T.C. Memo. 1978-162, we were satisfied that the removal of photo merchandising units and their bases did not cause "significant damage" to the units or to the parking lots on which the units were situated.  Additionally, in Fox Photo, Inc. v. Commissioner, supra, damage sustained upon the removal of the 1-hour photo labs was permissible because it was "cheaper to repair than building a new lab."  See also Scott Paper Co. v. Commissioner, 74 T.C. at 172 (primary electric components remained "intact and reusable" after their removal).

Acknowledging that the tanks sustain only minimal damage when moved intact, respondent's arguments with respect to this Whiteco factor focus on the dismantling and reconstruction method described in API Standard 653.  According to respondent, because the steel may not return to its original shape once the tanks are reconstructed, the tanks sustain damage when they are cut up and moved any distance.  Respondent also relies on Mr. Watson's opinion that a reconstructed tank never looks the same and, therefore, is an inferior product.

Even if dismantling and reconstructing a tank may somewhat distort the tank's shape, the record contains no evidence from

which to conclude that the damage would be significant or that the tank would no longer be usable. To the contrary, if the procedures in API Standard 653 are properly followed, the reconstructed tank will have an "acceptable appearance and structural integrity". In addition, during the years in issue, and after CITGO relocated Vicksburg tank No. 2 using this method, Vicksburg tank No. 2 remained in service. This factor favors petitioner.

F.  What Is the Manner of Affixation of the Property to the Land?

Petitioner asserts that the tanks are not fastened, tied, or otherwise attached to the land. According to petitioner, most of CITGO's tanks at issue merely rest on top of "native soil", and the remainder sit on concrete ringwall foundations, which foundations are not damaged when the tanks are moved. Respondent counters that the tanks' sheer weight and size affix them to the land.

In Whiteco Indus., Inc. v. Commissioner, supra at 666-667, the outdoor advertising signs' poles were driven 5 to 10 feet into the ground and were cemented in place by concrete rings. Even so, because the poles could "easily be removed from the ground", and were removed in practice, we concluded that the poles' manner of affixation to the land did not reflect permanence. Id. at 673.

In JFM, Inc. & Subs. v. Commissioner, T.C. Memo. 1994-239, we decided that the gasoline canopies were not permanently affixed to the land, even though the canopies' posts were bolted onto special concrete footings. We observed that, once the posts were unbolted, the concrete footings were the only "residual structures remaining on the land." Id.; see also Standard Oil Co. (Ind.) v. Commissioner, 77 T.C. at 407, 409 (service station sign poles bolted into concrete foundations were not permanently affixed); Fox Photo, Inc. v. Commissioner, T.C. Memo. 1990-348 (1-hour photo labs attached to their foundations, but easily removable, were not permanently affixed); Film N' Photos, Inc. v. Commissioner, supra (photo merchandising units attached to concrete bases that only rested on the parking lot were not permanently affixed to the land).

Unlike the property in Whiteco or JFM, CITGO's tanks are not buried underground or bolted to their foundations; the tanks rest on top of their foundations. Contending that the tanks' "massive weight and size * * * make them sufficiently affixed to the land for Whiteco purposes", respondent relies on Siler v. Commissioner, T.C. Memo. 1985-257.

In Siler, the property at issue was six horizontally positioned petroleum product storage tanks with 11,500- to 17,500-gallon capacities, which were cradled in the U-shaped top of concrete or brick piers extending 30 inches below ground. The

storage tanks had not been moved for at least 24 years. We applied Whiteco and held that the storage tanks were inherently permanent structures. With respect to the sixth Whiteco factor, we concluded that the storage tanks' sheer weight and girth affixed them to the piers, and we analyzed the storage tanks and the piers as "integrated units". In a footnote, we explained our decision to treat the storage tanks and piers as one unit as follows: (1) There was never an intention to move the storage tanks; (2) the storage tanks had never been moved; and (3) moving the storage tanks could be done only with great expense and difficulty. Siler v. Commissioner, supra.

Although Siler also involved petroleum product storage tanks, the facts of Siler are distinguishable from those of the present case. CITGO's tanks are vertical, whereas the storage tanks in Siler were cradled horizontally. Most importantly, the reasons we gave in Siler for treating the storage tanks and piers as one unit are not applicable to the present case: CITGO cannot realistically expect the tanks to remain permanently in place; CITGO has moved tanks in the past; and CITGO can move tanks without relatively great expense or difficulty when the cost of relocating tanks is compared to the cost of constructing new tanks. See supra pp. 8-9, 15-16.

We agree that CITGO's tanks have substantial weight, but the tanks are not affixed to their foundations in any manner that

would indicate the tanks are to remain there permanently. Consequently, we conclude that this factor favors petitioner.

G.  Conclusion

After carefully considering all of the facts and concluding that all six Whiteco factors favor petitioner, we hold that the tanks are not inherently permanent structures.  Accordingly, the tanks are included in asset class 57.0 of Rev. Proc. 87-56, 1987-2 C.B. 686, and treated as 5-year property under section 168(e)(1).

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decisions will be entered under Rule 155.